In re:

    Marvin Okeefe Chapman,                    Case No. 17-32878-jda
                                                                           Chapter 13
                           Debtor.                        Hon. Joel D. Applebaum
_____/

## OPINION GRANTING ROSE ACCEPTANCE, INC.'s MOTION FOR RELIEF FROM THE AUTOMATIC STAY

Before the Court is the Motion for Relief from the Automatic Stay (the "Motion") of Rose Acceptance, Inc. ("Rose") with respect to property identified as G4467 Clio, Mount Morris, Michigan (the "Property"). For the reasons set forth below, the Motion is GRANTED.

### Jurisdiction

This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(G), over which this Court has jurisdiction pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a).

### Factual Background

On March 17, 2011, Rose's parent corporation, First National Bank of America ("FNB"), sold the Property on land contract (the "FNB Land Contract") to Michael Ware ("Ware"). The FNB Land Contract was recorded with the Genesee County Register of Deeds on March 31, 2011. (Exhibit H).[1] The FNB Land Contract was subsequently assigned by FNB to Rose, although FNB retained the account servicing rights. Ware, in turn, transferred the Property to Debtor, Marvin

---

[1] On March 5, 2020, an evidentiary hearing was held on the Motion. The parties stipulated to admissibility of all exhibits without objection. Letters refer to exhibits introduced by Rose, and numbers refer to exhibits introduced by Debtor. In addition to exhibits introduced at the hearing, two witnesses testified: Adam Holland, Vice President of Rose, and Debtor, Marvin Okeefe Chapman.

Okeefe Chapman,[2] pursuant to a separate land contract dated March 26, 2011, which was not recorded with the Genesee County Register of Deeds until January 21, 2014. (Exhibit 2). According to Debtor, Rose knew of the transfer of the Property from Ware to Debtor and, more importantly, consented to it, thereby placing Debtor in privity of contract with FNB and/or Rose.[3] Rose, through Mr. Holland, denies that it was aware of this transfer until May 13, 2014, when Debtor's counsel sent a letter to Rose's counsel explaining for the first time that the Property had been transferred by land contract from Ware to Debtor, that Ware would be assigning his interest in the FNB Land Contract to Debtor, and committing to send a copy of the executed assignment to Rose (Exhibit 5). Mr. Holland further denies that Rose ever accepted or approved the transfer or assignment of the FNB Land Contract to Debtor. Nothing in the record evidences an assignment of the FNB Land Contract from Ware to Debtor or a written acceptance by Rose of this purported assignment. Nevertheless, Mr. Holland acknowledges that Rose received payments on the FNB Land Contract from Debtor or his company, Chapman Enterprises, LLC, and further acknowledges that Debtor was an authorized third-party such that Rose and Debtor could communicate about the account directly. Mr. Holland testified that such conversations occurred from time to time beginning in 2012.

On February 19, 2014, a judgment totaling approximately $7,800 was entered by the 67th District Court in favor of Rose and against Ware in connection with Ware's (or Debtor's) failure

---

[2] Debtor filed his Chapter 13 bankruptcy petition on December 21, 2017.
[3] Ware is Debtor's nephew and, according to Debtor, was a "partner" in Chapman Enterprises, LLC. The record does not reflect why Ware, as opposed to the LLC, purchased the Property originally, why the Property was subsequently transferred by Ware to Debtor rather than to the LLC, or why the land contract was not recorded until January 2014.

2

17-32878-jda    Doc 142    Filed 04/29/20    Entered 04/29/20 11:31:50    Page 2 of 16

to make any payments under the FNB Land Contract from July 2013 through February 2014. The judgment was satisfied in May 2014, and a Certificate of Satisfied Judgment was filed on May 12, 2014 (Exhibit 4).

Pursuant to the terms of the FNB Land Contract, in addition to the monthly land contract payments, Ware was obligated to fund a tax escrow based upon "an estimate of the monthly cost of the taxes and assessments" (Exhibit H). The amounts necessary to fully fund this escrow would necessarily fluctuate based upon applicable tax assessments. Adjustments were, therefore, contemplated under the FNB Land Contract and Ware, as purchaser, was responsible for payment of any deficiencies. *Id*. The FNB Land Contract further provided that, "[I]f the Purchaser is not in default under the terms of this contract," then Rose would pay the taxes directly to the taxing authority using the funds in the tax escrow account. *Id*.

At the two hearings preceding the March 5th evidentiary hearing on the present Motion, it became clear that, sometime after the Satisfaction of Judgment was filed on May 12, 2014, Rose terminated the tax portion of the escrow account. According to Rose, Ware was duly informed that he was now responsible for paying all property taxes on the Property directly to the taxing authorities. Debtor denies this. According to Debtor, it wasn't until sometime in May 2018, when he was served with a notice of judgment of tax foreclosure, that he first learned Rose was not paying property taxes as required under the FNB Land Contract. Debtor asserts that he was not in default under the land contract at that time and, more importantly, he would not have continued to include the tax escrow amount with his monthly land contract payments had he known Rose was

not using that money to pay his property taxes.[4] Debtor insisted he was entitled to an accounting to understand "how Rose applied his money." The Court agreed and scheduled the March 5, 2020, evidentiary hearing. The Court also permitted the parties to take discovery. E.D. Mich. LBR 7026-3.

At the March 5th evidentiary hearing, Mr. Holland testified utilizing seven spreadsheets (Exhibits A-G), all of which were admitted into evidence without objection. Through these spreadsheets, Mr. Holland was able to account for every payment received on the FNB Land Contract account and, more importantly, how every payment was applied – whether to principal and interest, tax or other escrowed amounts, late fees, insurance charges, legal fees and legal costs – beginning in March 2011, when the FNB Land Contract was first executed. Debtor's protestations to the contrary, when the Certificate of Satisfied Judgment was filed on May 12, 2014, the FNB Land Contract account was only current *as of February 2014*, the date the judgment of forfeiture was entered. By May 12, 2014, however, the account was again in default for the months of March and April and would soon be in default for May and June as well.

As payments were irregularly received thereafter, Rose applied the monthly principal and interest payment of $675.96 against the earliest overdue payment and funded the tax escrow account with the entire remainder. Rose did this despite its rights under the FNB Land Contract to apply money in excess of the monthly payment to unpaid monthly payments due, late fees, legal fees and the like. On July 21, 2014, for example, a payment was received in the amount of $1,600. Of this amount, $675.96 was applied against the March principal and interest payment which was

---

[4] Debtor acknowledges that, upon learning in May 2018 that Rose stopped paying property taxes, he stopped making *any* further payments under the FNB Land Contract.

now approximately 127 days overdue. Rather than apply the remainder against the missed April payment, Rose deposited the entire remainder into the tax escrow account. Future payments were applied consistently in this manner until December 2014, when the Winter property taxes came due. Despite depositing all amounts over and above the monthly payment into the escrow account, the tax escrow was underfunded and the amount in escrow insufficient to pay the property tax bill in full. Rose paid the deficiency amount out of its own funds but decided that, going forward, Ware should begin paying the property taxes directly. According to Mr. Holland, Rose made this decision for at least two reasons. First, the account was in default and Rose had the right to terminate the tax escrow under the terms of the FNB Land Contract. Second, prior to entering into the FNB Land Contract, Rose had successfully appealed its tax assessment thereby significantly lowering the property tax on the Property. After the FNB Land Contract was executed, however, the taxing authorities "uncapped" the tax rate and the amount of the property taxes increased dramatically. Neither Ware nor Chapman sought a tax rate reduction and Rose no longer had standing to do so. Because the rate was such that the tax escrow account would continue to be underfunded, Rose was unwilling to continue to fund the shortfall while the FNB Land Contract was regularly in default. Mr. Holland testified that notice of Rose's decision to terminate the tax escrow account was sent to Ware at the Property address (<u>Exhibit 7</u>). It is at this point that the dispute underlying the instant Motion truly begins.

After Rose stopped escrowing taxes, Rose applied monthly payments to the oldest overdue monthly payment. Any excess was applied to recoup amounts Rose paid to cover the previous tax

5

shortfall.[5] After the tax shortfall was fully recouped, future monthly payments were applied against overdue principal and interest payments. When the account was finally brought current (or again brought current, as payment defaults continued episodically), excess amounts were applied against accrued late fees, legal fees and legal costs as permitted by the FNB Land Contract. Once all late fees, legal fees and legal costs were recouped, amounts over and above monthly principal and interest payments were applied to reduce the outstanding principal balance. This occurred, for example, in December 2016, January 2017 and February 2017. (Exhibit A)

According to Mr. Holland, the termination of the tax escrow and the application of payments thereafter should not have come as a surprise to Ware or Debtor because a notice of tax escrow termination was sent to the Property (Exhibit 7), and 'mortgage' statements showing the breakdown of payments between principal and interest, late fees, legal fees, legal costs and CPI were sent monthly. In addition, when the account was overdue, members of FNB's collection department would write, call and, on occasion, visit the Property. If the account was more than 80 days overdue, something that occurred in the five or six months following the entry of judgment, notices of forfeiture were sent to the Property.

As previously noted, Debtor acknowledges that he stopped making any payments on the FNB Land Contract in May 2018. According to Mr. Holland, as of March 5, 2020, the payoff amount on the FNB Land Contract is:

| | |
|---|---|
| Outstanding principal balance | $54,622.67 |
| Outstanding accrued interest | $ 9,980.48 |
| Escrow Deficiency (CPI) | $    371.17 |

---

[5] Although no longer maintaining a tax escrow, the escrow account remained open. The only amounts being deposited into the escrow account, however, were for collateral protection insurance ("CPI") premiums totaling approximately $40 per month.

6

17-32878-jda    Doc 142    Filed 04/29/20    Entered 04/29/20 11:31:50    Page 6 of 16

| | |
|---|---|
| Late fees | $     338.00 |
| Legal fees | $  3,184.50 |
| Legal costs | $     725.98 |
| **Total** | **$69,222.80** |

According to Debtor, the judgment that was fully satisfied in May 2014 was strictly the result of a deficiency in the tax escrow account. Debtor testified that, after satisfying the judgment, he increased his monthly payment accordingly to account for any increased taxes. He did this on his own, however, without consulting Rose as to the amount necessary to fully fund the tax escrow. In stark contrast to Mr. Holland's testimony, Debtor testified that the account was entirely current when the satisfaction of judgment was filed in May 2014, and that the account remained entirely current until he stopped payments in May 2018. Debtor also testified that he had no communications with anyone at Rose in the four years between May 2014 and May 2018, when he stopped making payments on the FNB Land Contract. Debtor further testified that he did not receive any monthly statements, notices of forfeiture, yearly tax statements and, as a result, was utterly unaware that taxes were not being paid or that late fees or legal fees were accruing.[6] To support his claim that the account was current, Debtor introduced a series of remittance advices showing cashier's checks made payable to FNB, with the remitter being either Chapman Enterprises, LLC or Marvin Chapman, individually (Exhibit 10 and Exhibit 10A). However, each

---

[6] In January 2016, there was a surplus in the escrow account over and above the amount required for CPI funding, and an escrow surplus check in the amount of $398.30 was sent to the Property address. This check was cashed, evidencing at least some attention to mail delivered to the Property address.

remittance advice introduced by Debtor was already reflected in Rose's exhibits. Rose's exhibits also reflected several payments for which remittance advices were unavailable.

**Position of the Parties**

It is Debtor's position that the FNB Land Contract was properly assigned by Ware to Debtor and, by knowingly accepting payments from Debtor, Rose consented to this assignment. According to Debtor, Rose's termination of the tax escrow was a "material breach of contract for which Mr. Ware and/or his assignee Marvin Chapman are owed actual damages and those damages should be applied to reduce the outstanding principal balance owed on the Land Contract." *Debtor's Response to Creditor's Motion for Relief from the Automatic Stay* [Dkt. No. 111, ¶4]. After applying those damages against the outstanding balance on the FNB Land Contract, no (or only a *de minimus*) principal balance is owing on the FNB Land Contract. In other words, after setoff, either the payment terms of the FNB Land Contract have been satisfied or any *de minimus* amount owing can be easily cured and the contract assumed in connection with Debtor's chapter 13 plan.

Rose, in contrast, argues that the land contract between Ware and Debtor was not an assignment of the FNB Land Contract and, even if it was, Rose certainly did not consent to it. Because there was no valid assignment, Debtor's rights under the FNB Land Contract are entirely derivative of Ware's rights under that contract. Ware's rights, however, are unaffected by Debtor's bankruptcy. Since Rose has received no payments on the FNB Land Contract for at least two years, Rose should be able to pursue its remedies under the FNB Land Contract and applicable law against Ware as the land contract vendee. To the extent Debtor has any rights in the Property by virtue of his land contract with Ware, the stay should lift. There is simply no point in Debtor

assuming his land contract with Ware when Ware is losing the Property. Moreover, even if the FNB Land Contract was properly assigned, the FNB Land Contract is an executory contract under § 365 of the Bankruptcy Code. That land contract is in default. Because Debtor cannot cure the defaults or provide adequate assurance of future performance, among other reasons, he cannot assume the contract and, again, the automatic stay should lift.

## Legal Analysis

The Court finds that the land contract between Debtor and Ware was not an assignment of the FNB Land Contract, but rather an attempt to sell or transfer the Property to Debtor. Moreover, even were the Debtor/Ware land contract deemed to constitute an assignment, the Debtor did not prove Rose knew about or consented to the assignment.

The land contract between Ware and Debtor was entered into approximately one week after Ware entered into the FNB Land Contract. The Ware/Debtor land contract does not purport to assign the FNB Land Contract and, in fact, the FNB Land Contract is not referenced in the document at all. Although executed only a week or so after the FNB Land Contract, the sale price in the Ware/Debtor land contract is $4,000 higher than the sale price in the FNB Land Contract. This price discrepancy also evidences a sale, not an assignment. Moreover, nothing in the document requires Ware or Debtor to notify or obtain the consent of Rose to this transfer, although the FNB Land Contract contains a strict anti-assignment clause.[7] (Exhibit H, p. 2, ¶3(c)). In

---

[7] Under Michigan law, "a provision forbidding assignment of [land] contract is an absolute valid restriction where the contract remains executory, for the reason that the seller has a right to see that the property is kept in the hands of a responsible person who will properly care for it and make the payments until the contract is fully executed." *Jankowski v. Jankowski*, 18 N.W.2d 848, 849 (Mich. 1945). *C.f. Lemon v. Nicholai*, 190 N.W.2d 549 (Mich. Ct. App. 1971) (if contested assignment of land contract does not result in "waste or impairment or loss of security" then refusal

February 2014, Rose obtained a judgment from the 67th District Court *against Ware in connection with Ware's failure to make payments* under the FNB Land Contract from July 2013 through February 2014.  That this judgment was sought and obtained against Ware only evidences a lack of knowledge or consent by Rose to the transfer or assignment of the FNB Land Contract. Although it would have been appropriate to notify Rose of any assignment at this juncture, there is no indication in the judgment or the Certificate of Satisfied Judgment that Rose was even aware that the FNB Land Contract was purportedly assigned.

In May 2014, Ware's and Debtor's counsel sent a letter to Rose's counsel (Exhibit 5) in connection with the satisfaction of judgment that states in part:

> "[T]hat Marvin Chapman purchased the property from Michael P. Ware II, by 2nd Land Contract, dated March 26, 2011, copy enclosed for your reference.  Michael P. Ware, II and Marvin Chapman *have since agreed* that Michael P. Ware II *will assign* to Marvin Chapman his vendee interest in the Land Contract dated March 17, 2011, between First National Bank of America and Michael P. Ware, II.  *Once that assignment has been made, I will provide you a copy*."  (emphasis added).

As is evident from the italicized language in Exhibit 5, as of May 13, 2014, no assignment had taken place. This letter also corroborates Mr. Holland's testimony that Rose was unaware of the Ware/Debtor land contract, which was not even recorded until January 2014.  Moreover, nothing in the record evidences that, after May 13, 2014, an assignment document was ever executed or provided to Rose for its consideration and consent.  In light of the absence of any evidence to the contrary, the Court cannot find that Ware validly assigned the FNB Land Contract to Debtor, or that Rose consented to such an assignment.  Because the Court finds no valid

---

to consent may constitute an unreasonable and, therefore, unenforceable restraint on the alienation of property).

10

assignment of the FNB Land Contract, Rose's right to pursue forfeiture proceedings are, first and foremost, against Ware. *See Steinberg v. Fine*, 196 N.W. 367 (Mich. 1923) (in absence of express release of tenant, mere acceptance of rents from tenant's assignee, even with knowledge of assignment, does not discharge tenant from liability under lease.) Rose's rights against Ware under the FNB Land Contract, therefore, are largely, if not entirely, unaffected by Debtor's bankruptcy.

Any "legal or equitable interest" Debtor may have in the Property under § 541 of the Bankruptcy Code is rooted in the Ware/Debtor land contract. This contract was entered into in violation of the FNB Land Contract, resulting in the acceleration of the unpaid balance due under the FNB Land Contract. (*See* Exhibit H, p. 2, ¶3(c)). And even if the *entire* unpaid balance is not yet due, no payments have been made on the FNB Land Contract in at least the last two years. It is, therefore, apparent that Ware has lost or, shortly, will lose any interest he may have in the Property. There is no reason for Debtor to assume the Ware/Debtor land contract if the underlying Property will be lost. Thus, the Court finds cause under 11 U.S.C. §362(d)(1) to lift the automatic stay to permit Rose to terminate Debtor's interest in connection with any forfeiture or other proceedings brought against Ware. *In re Holly's, Inc.*, 140 B.R. 643, 687 (Bankr. W.D. Mich. 1992), quoting *In re Future Growth Enterprises, Inc.*, 61 B.R. 469, 472 (Bankr. E.D. Pa. 1986) ("Under § 362(d)(1) 'cause' for relief from the automatic stay is present when the lessor proves that the debtor is significantly in default under the lease, particularly when the debtor has failed to move successfully for assumption of the lease.")

Even were the Court to find that either the FNB Land Contract was assigned or that Rose's acceptance of payments from Debtor or his LLC constitutes consent to the assignment, the automatic stay must nevertheless be lifted to permit Rose to pursue its legal remedies.

The FNB Land Contract is an executory contract whose treatment is governed by § 365 of the Bankruptcy Code. *Terrell v. Albaugh (In re Terrell)*, 892 F.2d 469 (6th Cir. 1989). Here, in order to assume this executory contract, Debtor must (i) cure or provide adequate assurance that Debtor will promptly cure all monetary defaults; (ii) compensate or provide adequate assurance that Debtor will promptly compensate Rose for any actual pecuniary loss resulting from such default; and (iii) provide adequate assurance of future performance under the executory contract. *Id.*

In this case, Debtor argues that assumption under § 365 of the Bankruptcy Code is largely irrelevant. Rather, according to Debtor, he suffered actual damages as result of Rose's breach of the FNB Land Contract by its failure to pay the property taxes. After these damages are applied to the balance owning on the FNB Land Contract, the FNB Land Contract will either be satisfied in full or any *de minimus* amount that may remain unpaid can be paid in connection with Debtor's chapter 13 plan.

The problem with Debtor's argument is that it requires the Court to find, first, that Rose breached the FNB Land Contract by failing to make the property tax payments and, second, that Rose misused or misappropriated Debtor's funds in the tax escrow account. The Court can find no support for either assertion. To the contrary, utilizing Exhibits A-G, Mr. Holland credibly accounted for *every* payment received on the FNB Land Contract beginning in March 2011 when the FNB Land Contract was first executed by Ware. Not only did Mr. Holland account for every

12

17-32878-jda    Doc 142    Filed 04/29/20    Entered 04/29/20 11:31:50    Page 12 of 16

payment Rose received, he was able to show how every payment was applied – whether to principal or interest, taxes or other escrowed amounts, late fees, insurance charges, legal fees and legal costs. Based upon Mr. Holland's testimony and the Court's own review of Exhibits A-G, it is apparent that the FNB Land Contract was often in default. While Debtor testified that the FNB Land Contract was current as of May 2014 when the Certificate of Judgment Satisfaction was filed, for example, that was not the case. Rather, the FNB Land Contract was current only as of February 2014, the date the judgment of forfeiture was entered. When the Certificate of Judgment Satisfaction was filed, the FNB Land Contract was again in default for March and April 2014 and would soon be in default for May and June 2014 as well. As a result of these defaults, Rose had the right to terminate the tax escrow and require Debtor to make the tax payments directly. Moreover, in addition to these payment defaults, the monthly payment amounts (when made) were insufficient to fully fund the tax escrow, thereby requiring Rose to advance the tax deficiency and then seek to recoup it from its land contract vendee at a later date. Given the history of payment defaults under the FNB Land Contract, Rose was again within its rights to stop escrowing taxes or making the property tax payments directly.

Nor can the Court find that, once Rose stopped funding the tax escrow, it misappropriated or misused payments that should otherwise have funded the tax escrow. Again, Mr. Holland testified as to every payment received and how each payment was applied pursuant to the terms of the FNB Land Contract. Rose had the right to apply monies received against overdue payments, late fees, and the like. Rose's exercise of rights it had under the FNB Land Contract does not give rise to a claim of actual damages by Debtor.

13

Debtor does not appear to contest that Rose had a right under the FNB Land Contract to apply payments against overdue principal or interest amounts. Rather, Debtor argues that there were no overdue amounts because he voluntarily increased the amount of his monthly payments to account for any deficiency in the tax escrow amount. According to Debtor, Rose never informed him that Rose had stopped funding the tax escrow and was now requiring him to pay the property taxes directly. According to Debtor, he had absolutely no communications with Rose or FNB in the four years between May 2014 and May 2018 when he first learned about the tax foreclosure action. Had he known Rose was no longer escrowing for property taxes, he would have reduced his monthly land contract payments accordingly and used that money to satisfy his property tax obligations.

The Court finds Debtor's testimony difficult to reconcile with Mr. Holland's testimony that (i) Ware was informed about the termination of the tax escrow, (ii) a Notice of Tax Escrow Termination was sent to the Property, (iii) mortgage statements were provided monthly showing the breakdown of payments between principal and interest, late fees, legal fees and costs, and CPI, and (iv) that FNB's collection department wrote, called and, on occasion went to the Property to determine if it was inhabited. Moreover, at least one check sent to the Property was cashed, evidencing some attention to mail delivered to the Property (*see* footnote 6, *supra*). However, even if Debtor truthfully testified that he had no contact with Rose in the four years between May 2014 and May 2018, this does not absolve Debtor of responsibility for making tax payments and remaining current under the FNB Land Contract, nor does it make Rose liable for terminating the tax escrow. Debtor testified that he knew the amount needed to fully fund the tax escrow fluctuated; this was the reason for the February 2014 judgment. Moreover, Debtor needed

14

information about interest payments and property taxes for his own and/or his LLC's tax returns. It is, therefore, implausible that Debtor would make continuous payments on a land contract for four years without having any contact or communication with his land contract vendor particularly given his past experience. Any reasonable effort would have put Debtor on notice that the tax escrow was not being funded. Debtor cannot go four years having no contact with Rose without bearing responsibility for his alleged lack of knowledge.

Because the Court finds that Rose did not misappropriate or misuse Debtor's payments, Debtor did not suffer actual damages that may be set off against the outstanding balance on the FNB Land Contract. Thus, the requirements of § 365 are not irrelevant as Debtor contends. Debtor must cure all monetary defaults under the FNB Land Contract and provide adequate assurance that Debtor will be able to fully perform the contract going forward. Given the long history of defaults under the FNB Land Contract, the large outstanding tax obligations, the absence of any payments on the land contract for the last two years, and the terms of Debtor's proposed plan, Debtor is unable to assume the FNB Land Contract even assuming it was properly assigned. As noted above, the inability to assume this executory contract is cause for lifting the automatic stay. *In re Holly's, Inc.*, 140 B.R. at 687.

## Conclusion

For the forgoing reasons, the Motion for Relief From the Automatic Stay filed by Rose Acceptance, Inc. with respect to property identified as G4467 Clio, Mount Morris, Michigan is GRANTED.

NOT FOR PUBLICATION

**Signed on April 29, 2020**

/s/ Joel D. Applebaum

Joel D. Applebaum
United States Bankruptcy Judge